USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/9/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                 :

EDWARD A. PATERSON,               :      **REPORT & RECOMMENDATION**

              Plaintiff,         :      12-CV-3020 (LTS) (JLC)

     -- v. --                      :

CAROLYN W. COLVIN,           :
Acting Commissioner of Social Security,   :

             Defendant.      :
-------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

**To The Honorable Laura Taylor Swain, United States District Judge:**

       Plaintiff Edward Allan Paterson seeks judicial review of a final determination by the

Commissioner of Social Security ("Commissioner"), denying his application for disability

insurance benefits ("DIB"). The parties have cross-moved for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, I

recommend that Paterson's motion be granted to the extent that the case be remanded to the

Commissioner for further proceedings and the Commissioner's cross-motion be denied.

## I.     BACKGROUND

### A. Procedural History

       Paterson filed an application for DIB on May 12, 2009. Administrative Record ("R.")

(Dkt. No. 8, 14), at 123-26.[1] He seeks DIB for a closed period from March 25, 2008 to April 5,

---

[1] The Administrative Record is divided into two separate docket entries, the first of which has
four supplemental documents attached (Dkt. Nos. 8 to 8-4, 14). For clarity and consistency,
citations to the record will refer to the pagination which runs sequentially throughout the
various entries and is marked in bold in the lower right-hand corner.

2009 because of a torn left rotator cuff. *Id.* at 123, 139, 172-74, 296.[2]  The Social Security

Administration ("SSA") denied his claim at the first level of review. *Id.* 54-58.  Paterson

requested a hearing before an Administrative Law Judge ("ALJ") on August 7, 2009. *Id.* 65-66.

On September 24, 2010, Paterson, represented by counsel, appeared and testified before ALJ

Roberto Lebron. *Id.* at 22-52.  The ALJ found Paterson not disabled for the period under review,

and denied his claims in a written decision dated November 29, 2010. *Id.* at 9-21.  Paterson

sought review of the ALJ's decision by the Appeals Council, which request was denied on

March 20, 2012, *id.* at 1-6, making the ALJ's decision the final decision of the Commissioner.

Paterson timely commenced this action on April 17, 2012, seeking judicial review of the

Commissioner's decision under 42 U.S.C. § 405(g). *See* Complaint (Dkt. No. 1).  However, by

stipulation of the parties "because a complete copy of the [administrative] hearing transcript

[could] not be produced," the case was remanded to the SSA on July 27, 2012, pursuant to

sentence six of 42 U.S.C. § 405(g). (Dkt. No. 6); *see also* R. at 308-13.  On remand, ALJ Lebron

held a hearing on May 17, 2013 at which he took no testimony. R. at 294-307.  In an opinion

dated July 10, 2013, the ALJ again determined that Paterson was not disabled for the designated

period. *Id.* 282-93.  The Appeals Council declined jurisdiction on November 19, 2013, and the

ALJ's July 2013 decision thus became the Commissioner's final decision. *Id.* at 277-79.

On January 27, 2014, Paterson filed a letter motion to reopen this case. (Dkt. No. 9).

The Commissioner filed her Answer on February 14, 2014. (Dkt. No. 13).  Paterson moved for

---

[2] In his application for DIB, Paterson claimed disability from March 28, 2008 to April 2009. R.
at 123. An undated Disability Report indicates that Paterson was "out of work" until April 6,
2009. *Id.* at 139. In a "pre-hearing memorandum" dated September 16, 2010 and in his
December 16, 2010 appeal, Paterson's counsel defined the closed period of disability from
March 25, 2008 to April 6, 2009. *Id.* at 172-74. During the second ALJ hearing, Paterson
requested that he be considered for a closed period of disability from March 25, 2008 through
April 5, 2009, the day before he returned to work. *Id.* at 296.

judgment on the pleadings pursuant to Rule 12(c) on February 28, 2014. *See* Notice of Motion (Dkt. No. 15); Memorandum of Law ("Pl. Mem.") (Dkt. No. 16); Statement of Facts (Dkt. No. 17). The Commissioner filed a response on June 4, 2014, and cross-moved for judgment on the pleadings. *See* Notice of Motion (Dkt. No. 23); Statement of Facts (Dkt. No. 24); Memorandum of Law ("Def. Mem.") (Dkt. No. 25). Paterson filed his reply on June 9, 2014. *See* Supplemental Memorandum of Law ("Pl. Reply") (Dkt. No. 26).

### B. The Administrative Record

#### 1. Paterson's Background

Paterson was born on May 31, 1957, and was 50 years old on the alleged disability onset date. *Id.* at 24. He received his high school diploma and is certified as a waste water treatment plant operator. *Id.* at 26-27. He and his wife own a private residence in Pearl River, New York where they live with their two adult children. *Id.* at 25-26.

Paterson has worked as a waste water treatment plant operator for the Orangetown, New York Sewer Department since September 1984. *Id.* at 27-28, 140. According to Paterson, he "operate[d] the waste water treatment plant," which consisted of taking samples, checking pump stations, filling out log books, and generally monitoring the sewer department. *Id.* at 28. Paterson estimated that, during the course of an eight-hour workday, he walked for four hours, stood for two hours, and sat for two hours. *Id.* at 140. His job required him to frequently lift 50-pound objects, which were also the heaviest objects he had to lift. *Id.*

On December 5, 2007, Paterson injured his shoulder in a workplace fall. *Id.* at 139, 251. He explained that he tried to "work through the pain," but ultimately stopped working on March 28, 2008. *Id.* at 139. He had a successful surgery on April 7, 2008, which he said immobilized him for a period of six weeks. *Id.* at 29-30, 263-64. He also went to physical therapy. *Id.* at 30,

3

179-86.  Paterson's doctor prescribed him Celebrex and Hydrocodone-Acetaminophen, *id.* at

143-44, 237-38, which Paterson said provided effective pain relief, *id.* at 29.

Paterson returned to work on April 6, 2009, *id.* at 28, 139, where he was placed on "light

duty," because he was unable to perform his previous tasks, including reaching overhead,

crawling through the sewer, and "swing[ing] sledgehammers," *id.* at 34-35.  It appears from the

record that, during this time, someone accompanied Paterson to complete the tasks that he could

not.  *Id.* at 35.[3]

At the time of the first administrative hearing, Paterson reported pain in his left shoulder

that woke him up at night, and discomfort and numbness down his left arm through his fingers.

*Id.* 30-31.  However, the injury did not impair Paterson's ability to walk, stand, sit, bend, stoop,

or squat.  *Id.* at 32.  He was able to "use [his hands], no problem."  *Id.*  In the two or three

months before the first hearing, Paterson was able to lift a 25-pound container at work.  *Id.* at 33.

## 2.  Medical Evidence in the Record

### a.  Dr. Mark Medici's Records

Paterson first saw Dr. Mark Medici, an orthopedic surgeon, on December 19, 2007.  *Id.* at

251.  Dr. Medici treated Paterson throughout the closed period of his disability, seeing him at

least monthly.  *See id.* at 191-254.  At the first visit, Paterson described his pain as moderate to

severe, and Dr. Medici diagnosed Paterson with left "Rotator Cuff Syndrome."  *Id.* at 251, 253.

He recommended that Paterson start exercising at home and begin a physical therapy regimen,

for which he provided a prescription.  *Id.* at 253.

---

[3] The transcript says:  "They gave me [INAUDIBLE] with me, and he had to do, he had to do
everything."  R. at 35.

4

An MRI of Paterson's left shoulder was performed on February 19, 2008 at Dr. Medici's request. *Id.* at 176. At a follow-up visit on February 27, Dr. Medici concluded that Paterson had a left rotator cuff tear. *Id.* at 243. He advised Paterson to continue his home exercises, but discontinue the physical therapy. *Id.*

On April 7, 2008, Dr. Medici performed a left shoulder arthroscopy to complete a subacromial decompression[4] and repaired the rotator cuff tear in an open procedure. *Id.* at 263. Dr. Medici reported that Paterson "tolerated the procedure well. There were no complications and he was transferred to the recovery room . . . in stable condition." *Id.* at 264.

Dr. Medici did not evaluate Paterson's shoulder pain and weakness during the first few post-operative visits because it was "too early to assess the results" of surgery. *Id.* at 227, 230, 233. At a June 17, 2008 visit, Dr. Medici described Paterson's shoulder pain and weakness as "improved" and noted that his response to the physical therapy was "good." *Id.* at 224. He further noted that Paterson had only trace joint tenderness and mild pain when moving his left arm. *Id.* at 225. According to Dr. Medici's notes from the following month, Paterson's shoulder continued to show signs of improvement. *Id.* at 221. From June through September, Dr. Medici described Paterson's pain using the same phrase (trace joint tenderness and mild pain with movement), but observed that his range of motion had increased. *Id.* at 213, 216, 219, 222, 225.

On July 17, 2008, Dr. Medici requested a second MRI of Paterson's left shoulder, *id.* at 222, which was performed on August 5, 2008, *id.* at 177. Dr. Medici then made a request to workers' compensation for a "manipulation of the left shoulder under anesthesia to achieve a

---

[4] Subacromial decompression is a procedure by which a surgeon enters the "space above the rotator cuff" and "smoothes off the spur that is contributing to inflammation and impingement on the rotator cuff." The Cleveland Clinic, Arthroscopic Shoulder Decompression, http://my.clevelandclinic.org/orthopaedics-rheumatology/treatments-procedures/arthroscopic-shoulder-decompression.aspx.

greater [range of motion]," *id.* at 216, a request he repeated on September 24, *id.* at 213. While there are no records reflecting that Dr. Medici performed this procedure, at Paterson's next visit, on October 22, Dr. Medici noted that Paterson's range of motion had improved and described Paterson as having no tenderness and only trace pain with movement. *Id.* at 210. He said that Paterson should focus on "strengthening and conditioning" to "regain form and function." *Id.*

At Paterson's November 21, 2008 visit, Dr. Medici noted that Paterson showed further improvement in his range of motion; however, he described Paterson's range of motion as mild to moderately limited. *Id.* at 207-08. On December 22, Dr. Medici said that Paterson planned to return to work in approximately one month. *Id.* at 205. Dr. Medici's notes from December 22, 2008 to April 2, 2009 reflect no changes in Paterson's pain, range of motion, or arm and shoulder strength. *Id.* at 192, 195, 198, 201, 204. However, during this same time period, Dr. Medici regularly characterized Paterson's pain and weakness as "improved" or "somewhat less severe." *Id.* at 191, 194, 197, 200, 203. Also during this time frame, Dr. Medici went from describing Paterson's work status as "unable to work. TEMP TOTALLY DISABLED," *id.* at 205 (December),[5] to unable to work for one month, *id.* at 198 (February), to noting that Paterson planned to return to work on April 6, *id.* at 195 (March). On April 2, Dr. Medici noted that, when Paterson returned to work on April 6, it would be on "modified duty." *Id.* at 192.

### b. Records from Physical Therapy

In accordance with Dr. Medici's recommendation, Paterson started physical therapy at Clarkstown Physical Therapy. *See id.* at 179-86. While Clarkstown's records appear to indicate that Paterson received physical therapy from December 1, 2007 to May 1, 2009, *id.* at 179, the

---

[5] Dr. Medici also used the "unable to work. TEMP TOTALLY DISABLED" formulation in his notes from July, October, and November 2008. R. at 208, 210, 222.

progress notes span June 17, 2008 to January 21, 2009, *id.* at 180-86. The first note reflects that Paterson rated his pain a six out of ten, and that his range of motion was "improving slowly." *Id.* at 180. The following month, Paterson's therapist noted that his left arm fatigued easily and he had difficulty lifting a gallon of milk. *Id.* at 181. Paterson graded his pain as seven or eight out of ten upon waking up in the morning, but said that his range of motion improved during the day. *Id.* In September, Paterson's therapist reported that his pain was decreasing and his range of motion improving. *Id.* at 182. In an October 21 note, the physical therapist wrote that Paterson's range of motion continued to improve; however, the therapist also commented that Paterson had "difficulty reaching [and] lifting something off a shelf at shoulder level or higher." *Id.* at 183. By December 18, Paterson rated his pain a four out of ten, although he continued to have pain with quick movements and reaching overhead. *Id.* at 185. On January 21, 2009, his therapist similarly noted that, while Paterson's pain was intermittent and a four out of ten, he had "major difficulties" reaching and keeping his arm raised "for any length of time." *Id.* at 186.

### c. SSA Assessment

On July 8, 2009, J. Foley, an SSA employee, reviewed Paterson's medical records and completed a "Physical Residual Functional Capacity Assessment." *Id.* at 267-72. Foley described the conclusions as not "significantly different" from those of Dr. Medici, based on his review of the medical records. *Id.* at 271. Specifically, Foley determined that Paterson could occasionally lift and/or carry up to twenty pounds and frequently lift and/or carry up to ten pounds.[6] *Id.* at 268. Foley also noted that Paterson's ability to push and/or pull was limited in

---

[6] The assessment defined "frequently" as "occurring one-third to two-thirds of an 8-hour workday," and "occasionally" as occurring "from very little up to one third of an 8-hour workday." R. at 267.

7

his upper extremities, as was his ability to reach in all directions, *id.* at 268-69. Foley indicated

that Paterson should "avoid frequent overhead reaching with left upper extremity." *Id.* at 269.

### 3.   First Administrative Hearing

ALJ Lebron held a hearing on September 24, 2010 to consider Paterson's eligibility to

receive DIB benefits. *Id.* at 22-52. Paterson was represented by counsel. *Id.* The hearing was

conducted by video teleconference, with the ALJ in White Plains, New York, *id.* at 24, while

Paterson and his attorney; the vocational expert, Salvatore Garozzo; and the medical expert,

Dr. Gerald Greenberg were in Goshen, New York, *id.* at 74-75, 83, 85. Perhaps as a result of the

teleconferencing, in the transcript numerous portions of the testimony are deemed "inaudible" by

the reporter. *See, e.g., id.* at 31, 35, 38-40, 45. While such gaps are noted throughout the

transcript, Dr. Greenberg's testimony was most affected. *Id.* at 36-45.

The ALJ started the hearing by taking Paterson's testimony. After Paterson gave his

basic biographical information, *id.* at 24-27, he described his job as a waste water treatment plant

operator, *id.* at 27-29. Paterson's attorney had him explain the accommodations he received

because of his injury after returning to work on light duty. *Id.* at 34-35. The ALJ also asked

Paterson about his surgery and post-operative treatment, including a brace, medication, and

physical therapy, as well as Paterson's current pain and physical limitations. *Id.* at 29-33.

During questioning by his attorney, Paterson described his post-operative physical limitations.

*Id.* 35-36.

Next, the ALJ and Paterson's attorney questioned Dr. Greenberg, a non-treating

physician. *Id.* at 36-45. However, as noted, a significant portion of Dr. Greenberg's testimony is

marked "inaudible" in the transcript. Dr. Greenberg testified that Paterson's injury did not meet

the severity requirement for a listed impairment "for the whole period of time" alleged. *Id.* at

8

37-38.  He also testified that Paterson needed only three or "four months of recovery, before he would have been capable, at least of [a] sedentary level of activity," *id.* at 40, 42, after which "he might have difficulty for a few more months using his left shoulder," *id.* at 43.  Unfortunately, in response to several questions, crucial parts of Dr. Greenberg's answers are inaudible.  *See, e.g.*, *id.* at 42 ("I think that, based on the record, that he would be capable of [INAUDIBLE] within three months of the surgery."), 45 (when asked whether he believed that Paterson was unable to work during the relevant period, Dr. Greenberg said:  "Not [INAUDIBLE] yes.").

Finally, the ALJ took the vocational expert Salvatore Garozzo's testimony.  *Id.* at 45-50.  Garozzo testified that, while the Directory of Occupational Titles lists the exertion level for a sewage treatment plant operator as light, based on Paterson's description of his job, he performed the job at a medium exertion level.  *Id.* at 46-47.  Given Paterson's limited ability to use his left shoulder, Garozzo said Paterson could not perform his past relevant work.  *Id.* at 47.  However, Garozzo identified several other jobs he believed Paterson could perform in light of his age, education, previous work experience, and current physical limitations.  *Id.* at 47-49.  When Paterson's attorney asked Garozzo whether his analysis would change if Paterson's use of his left arm was limited in all directions, not simply overhead, Garozzo identified other jobs which Paterson could perform, but noted that the "total number of jobs would be eroded."  *Id.* at 49-50.

### 4.   Second Administrative Hearing

The parties stipulated to a remand of this case, *id.* at 308-09, and the Appeals Council ordered a *de novo* hearing "because significant portions of the transcript of the hearing held on September 24, 2010, are inaudible and were not able to be transcribed."  *Id.* at 312.  Accordingly, on May 17, 2013, ALJ Lebron held another hearing at which Paterson appeared with his attorney.  *Id.* at 294-307.  Despite the order for a *de novo* hearing and the stated reason for it, no

9

testimony was taken at the hearing.  *Id.*  Rather, the hearing consisted solely of a colloquy between the ALJ and Paterson's counsel.  The ALJ stated that he reviewed the record and then summarized Garozzo's testimony from the first hearing, some details of which he debated with Paterson's attorney.  *Id.* at 298, 300-01.  The ALJ did not mention Dr. Greenberg's testimony, although Paterson's attorney noted that Dr. Greenberg previously testified that Paterson "could only do sedentary work."  *Id.* at 303.  Then, despite explaining to the ALJ the reason for the *de novo* hearing, *id.* at 299, Paterson's counsel agreed to accept "the substantive parts of [the ALJ's] findings" from his previous decision, and declined the ALJ's offer to take more testimony from Paterson.  *Id.* at 304-05.

## II.    DISCUSSION

### A. Legal Standards

#### 1.    Judicial Review of Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g).  The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether the decision is supported by substantial evidence.  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U. S. 389, 401 (1971)) (internal quotation marks and alterations omitted).  In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Selian*, 708 F.3d at 417

(quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).  On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  Remand is "particularly appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, 'further findings would . . . plainly help to assure the proper disposition of [a] claim.'"  *Kirkland v. Astrue*, No. 06-CV-4861 (ARR), 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008) (quoting *Butts*, 388 F.3d at 386).

The substantial evidence standard is a "very deferential standard of review," *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012), and the reviewing court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted).  In other words, "once an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'"  *Brault*, 683 F.3d at 448 (emphasis omitted) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

**2.    Commissioner's Determination of Disability**

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  Physical or mental impairments must be "of such severity that [the individual] is not only unable to do his previous work but cannot, considering his age, education,

11

and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In general, when assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)); *see also Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur*, 722 F.2d at 1037 (citations omitted).

### a. Five-Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step inquiry. *Cichocki v. Astrue*, 729 F.3d 172, 173 n.l (2d Cir. 2013) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996). First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not employed, at the second step the Commissioner determines whether the claimant has a "severe impairment" restricting his ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has a severe impairment, the Commissioner moves on to the third step, considering whether the claimant has an impairment that is listed in Appendix 1 to 20 C.F.R. Pt. 404, Subpt. P (a "Listing"). 20 C.F.R. § 404.1520(a)(4)(iii). If so, the Commissioner will find the claimant disabled. *Id.*; 20 C.F.R. § 404.1520(d). If not, the Commissioner continues on to the fourth step, a determination of

whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step, ascertaining whether the claimant possesses the ability to perform any other work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant bears the burden of proving disability in steps one through four of the sequential analysis. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner on the fifth and final step, when she must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks and citation omitted). As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. Specifically, under the applicable regulations, the ALJ is required to "develop a complete medical record before making a disability determination." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d)-(f)).

Whether the ALJ has met his duty to develop the record is a threshold question. Before determining whether or not the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely

developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM), 2010 WL

2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human

Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782

(FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully

develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174

F.3d 59 (2d Cir. 1999)).  This imperative remains in force even where the claimant is represented

by counsel.  *Perez*, 77 F.3d at 47.

### c.  Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining

whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No.

11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (internal quotation

marks omitted) (citing 20 C.F.R. § 404.1527(d), 416.927(d)).  However, a treating physician's

opinion is given controlling weight—that is, it is binding—provided the opinion as to the nature

and severity of an impairment "is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

record."  20 C.F.R. § 404.1527(c)(2); *see also Selian*, 708 F.3d at 418 ("The opinion of a treating

physician on the nature or severity of a claimant's impairments is binding if it is supported by

medical evidence and not contradicted by substantial evidence in the record.") (citing *Burgess*,

537 F.3d at 128 and *Green-Younger v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003)).  The

regulations define a treating physician as the claimant's "own physician, psychologist, or other

acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation

and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R.

§ 404.1502.  Deference to such a medical provider is appropriate because they "are likely to be

14

the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2).

Under certain circumstances, however, a treating physician's opinion will not be controlling.  For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner.  *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(l), 416.927(e)(l)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). Additionally, where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 32) (internal quotation marks omitted) (alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician if clinical findings are inadequate).  As a result, "the 'treating physician rule' is inextricably linked to the duty to develop the record.  Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant

treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination." *Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust."), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry, the ALJ must consider several factors outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see also* 20 C.F.R. § 404.1527(c)(2). If, based on these considerations, the ALJ declines to give controlling weight to the treating physician's opinion, the ALJ must nonetheless "comprehensively set forth reasons for the weight" ultimately assigned to the treating source. *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133 (responsibility of determining weight to be afforded does not "exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (referencing *Schaal*, 134 F.3d at 505, and 20 C.F.R. § 404.1527(d)(2)).[7] The regulations require that the SSA "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted). Indeed, "[c]ourts have not hesitate[d] to remand [cases] when the Commissioner has not provided good reasons." *Pena ex*

---

[7] On March 26, 2012, a portion of 20 C.F.R. § 404.1527 was modified. The section that described the factors for an ALJ to consider when deciding how to weigh a treating physician's opinion was moved from subsection (d)(2) to (c)(2).

*rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (second and third alteration in original) (internal quotation marks omitted).

The courts leave it to the finder of fact to resolve any conflicts there may be in the medical testimony, but the ALJ need not "reconcile explicitly every conflicting shred of medical testimony." *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)). A court may not substitute its judgment so long as the decision of the ALJ, and ultimately that of the Commissioner, "rests on adequate findings supported by evidence having rational probative force." *Galiotti*, 266 F. App'x at 67 (quoting *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002)).

### d.  Claimant's Credibility

As to the credibility of a claimant, here too, the reviewing court must defer to an ALJ's findings. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "In assessing a plaintiff's subjective claims of pain and other symptoms, the ALJ must first determine that there are 'medical signs and laboratory findings which show that [the claimant has] a medical impairment which could reasonably be expected to produce the pain.'" *Vargas v. Astrue*, No. 10-CV-6306 (PKC), 2011 WL 2946371, at *11 (S.D.N.Y. July 20, 2011) (quoting *Snell*, 177 F.3d at 135 and 20 C.F.R. § 404.1529(a)). So long as the "findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Vargas*, 2011 WL 2946371, at *11 (quoting *Aponte v. Sec'y of Health and Human Servs. of the U.S.*, 728 F.2d 588, 591 (2d Cir. 1984)). However, these findings must "be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *10 (S.D.N.Y. Dec. 3, 2008) (internal quotation marks omitted) (quoting *Williams*, 859 F.2d at 260-61).

Because subjective statements about symptoms alone may not establish a disability, the ALJ follows a two-step analysis for evaluating assertions of pain and other limitations. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). First, the ALJ must weigh whether "the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). If the answer to the first step of the analysis is yes, the ALJ proceeds to the second step, considering "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Id.* (citing 20 C.F.R. § 404.1529(a)) (internal quotation marks omitted). Because "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," the ALJ may take into account a variety of other considerations as evidence. *Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)). These include: a claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that aggravate the symptoms; treatment and medication necessitated by the pain or other symptoms and their effects; other alleviating measures taken by the claimant; and other factors that relate to the claimant's functional limitations and restrictions stemming from pain or other symptoms. *Id.* (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

**B. The ALJ'S Decision**

In his July 10, 2013 decision, ALJ Lebron determined that Paterson did not meet the statutory definition of disability under the Social Security Act, and therefore denied Paterson's DIB claim. R. at 282-93. Following the five-step inquiry into disability, the ALJ first determined that Paterson did not engage in substantial gainful activity from March 25, 2008

through April 6, 2009. *Id.* at 287.[8]  At step two, the ALJ found that Paterson had the following severe impairment: "left shoulder impairment, status post surgery." *Id.*  At step three, the ALJ determined, without explanation, that Paterson's impairment did not meet or equal a Listing. *Id.*

The ALJ then moved on to step four, determining whether Paterson had the RFC to perform his past relevant work. *Id.* at 287-89.  The ALJ found that Paterson had the RFC "to perform light work as defined in 20 C.F.R. 404.1567(b) except he was able [*sic*] to frequently reach in all directions with the left upper extremity," *id.* at 287,[9] and accordingly, could not perform his past work as a waste water treatment plant operator, *id.* at 289.  In reaching this conclusion, the ALJ found that Paterson's impaired shoulder could be expected to have caused his alleged symptoms, but that Paterson's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." *Id.* at 288.  The ALJ also gave "little weight" to Dr. Medici's opinion that Paterson was "totally temporarily disabled" because it was not consistent with the doctor's records and opined on an issue reserved for the Commissioner. *Id.* at 289.  The ALJ did not discuss Garozzo's or Dr. Greenberg's testimony from the first hearing.

At the fifth and final step, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that Paterson could perform. *Id.* at 289-90.

## C. Analysis

Paterson contends that the ALJ erred in two ways.  First, he argues that the ALJ did not appropriately evaluate his credibility. Pl. Mem. at 1.  He also claims that the ALJ's step three determination was made in error because the ALJ failed to give appropriate weight to Paterson's

---

[8] *But see supra*, n.2.

[9] The ALJ presumably meant "unable," rather than "able."

treating physician in favor of the medical expert's testimony, which he says should be stricken because of the inaudible portions. *Id.* at 1-2; Reply Mem. at 1. For the reasons that follow, the Court finds that Paterson's claims are without merit; however, the Court also finds that the ALJ failed to meet his obligation to develop the record, and therefore recommends that the case be remanded.

### 1. Paterson's Credibility

Paterson first contends that the ALJ improperly discredited his testimony regarding the severity of his symptoms. Pl. Mem. at 1. He says that, because he returned to work, his credibility "should not be impugned." *Id.* However, the ALJ "evaluate[d] the credibility of [Paterson's] complaints and render[ed] an independent judgment in light of the medical findings and other evidence," not Paterson's motivation to return to work. *Nunez v. Astrue*, No. 11-CV-8711 (PKC), 2013 WL 3753421, at *11 (S.D.N.Y. July 17, 2013) (citing *Mimms v. Heckler*, 750 F.2d 180, 185-86 (2d Cir. 1984)). Specifically, the ALJ observed that Paterson's claims contradicted treatment records that reflected "good response to post-operative and physical therapy treatment" with only mild pain and mild to moderate range of motion limitations. R. at 288-89. While the ALJ did not include it in his second opinion, in his first opinion, he also relied on Paterson's testimony regarding the efficacy of pain medications and the fact that Paterson reported no limitations in his ability to sit, stand, or walk. *Id.* at 16. For these reasons, the ALJ's credibility determination is supported by substantial evidence, and the Court should defer to it. *See Tankisi v. Comm'r of Soc. Sec.*, 521 Fed. App'x 29, 35 (2d Cir. 2013) ("Generally, it is the function of the ALJ, not the reviewing court, to appraise the credibility of witnesses.").

### 2.     The ALJ's Step Three Determination

Paterson also argues that the ALJ erred at step three in determining that Paterson's injury did not meet or equal a Listing. Pl. Mem. at 1-2. Specifically, Paterson contends that the ALJ did not follow the treating physician rule, granting too much weight to Dr. Greenberg, the non-examining medical expert, and failing to give appropriate deference to Dr. Medici, his treating physician. *Id.* However, the ALJ's discussion of the medical opinion evidence appears in his analysis of Paterson's RFC at step four, not his assessment of the Listings, which determination he made without explicit analysis. R. at 287. Moreover, Paterson does not explain why, if the ALJ had weighed the evidence as he suggests, a listed impairment would be dictated, nor can the Court independently discern any reason for such a conclusion.[10]  Accordingly, a remand should not be granted on this basis.

### 3.     The ALJ's RFC Determination

Although Paterson's argument regarding the ALJ's evaluation of the medical opinion evidence is not relevant to the ALJ's step three analysis, it is properly considered in the context of the ALJ's determination of Paterson's RFC at step four.  However, the ALJ did not, as Paterson contends, rely too heavily on Dr. Greenberg's opinion or fail to afford Dr. Medici's opinion sufficient deference.  Rather, the ALJ failed to develop the record sufficiently to support his RFC finding, and accordingly, a remand should be granted on this basis.

#### a.     The ALJ's Evaluation Of Medical Opinion Evidence

First, the ALJ did not weigh Dr. Greenberg's testimony too heavily.  In fact, the ALJ's second decision does not refer to Dr. Greenberg's testimony at all.  *See* R. at 285-90.  In support

---

[10] In order to qualify for a Listing, the regulations describe musculoskeletal impairments to joints as involving "one major peripheral joint in *each* upper extremity."  20 C.F.R. § 404, App. 1, 1.02(B) (emphasis added).

of his argument, Paterson cites to references to Dr. Greenberg's testimony from the ALJ's first decision, which is not before this Court. Pl. Mem. at 1-2. In her cross-motion, the Commissioner surmises that the ALJ omitted Dr. Greenberg's testimony from his decision because so much of the testimony was inaudible. Def. Mem. at 7. Indeed, had the ALJ relied on Dr. Greenberg's opinion, the Court would have been at a disadvantage when trying to evaluate whether the ALJ's decision was supported by substantial evidence. *See, e.g.*, *Pratts*, 94 F.3d at 38 ("Faced with such an incomplete record of [the claimant's] hearing, we of course cannot say the ALJ's decision is supported by substantial evidence."); *Acevedo v. Astrue*, No. 11-CV-8853 (JMF) (JLC), 2012 WL 4377323, at *17 (S.D.N.Y. Sept. 4, 2012), *report and recommendation adopted sub nom. Acevedo v. Comm'r of Soc. Sec.*, 2012 WL 4376296 (S.D.N.Y. Sept. 24, 2012) (remanding for, *inter alia*, missing hearing transcript). This was the basis for the parties' stipulated remand and the Appeals Council's order to conduct a *de novo* hearing. R. at 308-09, 312; *accord Patel v. Astrue*, No. 10-CV-1437 (JG), 2010 WL 5093371, at *1 n.2 (E.D.N.Y. Dec. 10, 2010) (Appeals Council remanded for new hearing where "the record was incomplete because of the missing transcript").

The ALJ also gave appropriate weight to Dr. Medici's opinion. While, generally, a treating physician's opinion is given "controlling weight" if it is "well-supported . . . and is not inconsistent with the other substantial evidence in [the claimant's] case record," 20 C.F.R. § 404.1527(c)(2), a treating physician's opinion on the ultimate question of a claimant's disability is not similarly considered, *id.* at § 404.1527(d)(1). A treating physician's statement "that the claimant is 'disabled' or 'unable to work' is not controlling" because it is a legal conclusion reserved for the Commissioner. *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.

1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."); *Francois v. Astrue*, No. 09-CV-6625 (HB), 2010 WL 2506720, at *6 (S.D.N.Y. June 21, 2010) (no "special significance" afforded to treating physician's "dispositive determinations of disability"). Accordingly, the ALJ gave "little weight" to Dr. Medici's opinion that Paterson was "totally temporarily disabled" because "issues of whether a claimant is disabled are reserved for the Commissioner." R. at 289 (citing SSR 96-5p).[11]

Even though a treating physician's opinion on the question of disability is not entitled to the same deference as the rest of his opinion, an ALJ still must explain why he does not credit the treating physician's opinion on this question. *Snell*, 177 F.3d at 134. Here, the ALJ noted that Dr. Medici's finding of disability was not consistent with the doctor's "own mild examination findings" and was not supported with a function-by-function assessment. R. at 289. He also noted that, in March 2009, Dr. Medici had "cleared [Paterson] to return to regular duty work." *Id.* at 288; *see Francois*, 2010 WL 2506720, at *6 (ALJ noted physician's opinion that claimant could return to light duty work when discounting description of claimant as "disabled from work"). The ALJ, therefore, properly discounted Dr. Medici's legal conclusion regarding Paterson's disabled status and adequately explained his reasons for doing so.

### b. The ALJ's Failure to Develop the Record

However, the ALJ failed to develop the record sufficiently to support his finding that Paterson had the RFC to perform light work for some or all of the period of alleged disability. As the ALJ noted in his discussion of Dr. Medici's opinion, the doctor did not provide a

---

[11] It appears that the ALJ relied on Dr. Medici's treatment notes and findings in all other respects. In particular, the ALJ approvingly cited Dr. Medici's descriptions of Paterson's pain and range of motion limitations, and relied on these medical records to discount Paterson's own descriptions of his symptoms. R. at 288-89.

"function-by-function" assessment. R. at 289. It is not clear from the record whether the ALJ

ever requested such an assessment from Dr. Medici. While the failure to request a function-by-

function assessment is not *per se* grounds for a remand, *Tankisi*, 521 Fed. Appx. at 33-34,

"because an RFC determination is a medical determination," it is error for the ALJ to make this

determination "based on medical reports that do not specifically explain the scope of the

claimant's work-related capabilities." *McClaney v. Astrue*, No. 10-CV-5421 (JG) (JO), 2012

WL 3777413, at *10 (E.D.N.Y. Aug. 10, 2012) (internal citation and quotation marks omitted).

Here, the lack of such analysis from Paterson's treating physician left the ALJ with an

incomplete record on which to base his own RFC determination and a remand is thus warranted.

*Compare Goodale v. Astrue*, No. 11-CV-821 (VEB), 2012 WL 6519946, at *8-9 (N.D.N.Y. Dec.

13, 2012) (not error where record contained "extensive records of treatment covering virtually

the entire period of alleged disability"), *with Swanson v. Colvin*, No. 12-CV-645S, 2013 WL

5676028, at *4-5 (W.D.N.Y. Oct. 17, 2013) (case remanded based on lack of function-by-

function assessment where record did not contain "formal or informal RFC assessment by a

treating source").

A job defined in the regulations as "light work" involves, *inter alia*, "lifting no more than

20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20

C.F.R. § 404.1567(b). Here, there is nothing in the record based on which the ALJ could have

determined that Paterson was capable of lifting this much weight during the closed period of

disability. *See Tricic v. Astrue*, No. 6:07-CV-9997 (NAM) (GHL), 2010 WL 3338697, at *3-4

(N.D.N.Y. Aug. 24, 2010) (remanding where, without treating physicians' functional

assessments, "there is no medical evidence in the record which would support the finding by the

medical consultant or the ALJ regarding the amount of weight plaintiff could lift and carry.").

24

Indeed, Dr. Greenberg refused to opine on Paterson's lifting ability for precisely this reason. R.

at 43. There appear to be only two references in the medical record to Paterson's ability to lift or

carry. The first is a July 2008 physical therapy note, in which the therapist wrote that Paterson

had difficulty lifting a gallon of milk with his left hand. R. at 181. However, this therapy note

demonstrates only that, in July 2008, Paterson's lifting ability likely would have prevented him

from performing light work. It provides no basis for the ALJ to make a determination about

Paterson's ability at any later date during the alleged period of disability. The second reference

to Paterson's ability to lift and carry is in the RFC questionnaire completed by J. Foley, a non-

examining SSA employee. *Id.* at 268. Foley found that Paterson's abilities to lift and carry

perfectly matched the requirements of light work. *Id.* However, by virtue of being a non-

examining source, this opinion is based on the same medical records as the ALJ's opinion, and

thus for the same reasons, this finding has no basis in the record. Accordingly, the ALJ made his

RFC determination without a basis upon which to evaluate Paterson's functional ability, and the

case should be remanded.

### III.   CONCLUSION

For the foregoing reasons, I recommend that Paterson's motion for judgment on the

pleadings be granted, the Commissioner's cross-motion be denied, and the case be remanded to

the ALJ pursuant to sentence four of 42 U.S.C. § 405(g). Specifically, I recommend that, on

remand, the ALJ should:

(1)    Request from Dr. Medici a function-by-function assessment of Paterson's

limitations during the alleged period of disability; and

(2)    Develop the record with other evidence of Paterson's functional limitations during

this period (if such records cannot be provided by Dr. Medici).

## PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to such objections,

shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the

Honorable Laura Taylor Swain and to the chambers of the undersigned, United States

Courthouse, 500 Pearl Street, New York, New York, 10007. Any requests for an extension of

time for filing objections must be directed to Judge Swain.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL**

**RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE**

**REVIEW.** *See Thomas v. Arn*, 474 U.S. 140 (1985); W*agner & Wagner, LLP v. Atkinson,*

*Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72.

Dated: New York, New York
      September 9, 2014

JAMES L. COTT
United States Magistrate Judge